UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| MAN AGAINST XTINCTION A/K/A M.A.X | ) ) ) ) | **Civil Action No.** |
| Plaintiff | ) | **1:19cv406LEW** |
| v. | ) ) | |
| COMMISSIONER, STATE OF MAINE DEPARTMENT OF MARINE RESOURCES | ) ) ) ) | |
| and | ) ) | |
| ASSISTANT ADMINISTRATOR, NATIONAL MARINE FISHERIES SERVICE ("NMFS") | ) ) ) ) | |
| Defendants | ) ) | |

## DECLARATION OF ERIN SUMMERS

I, Erin Summers, hereby declare as follows:

1.  I have been employed by Maine Department of Marine Resources' ("ME DMR") for 14 years. I was originally hired as a Marine Resource Scientist I, with a working title of Protected Species Biologist. I was promoted to the position of Marine Resource Scientist IV in January of 2017 and am currently the Director of the Division of Biological Monitoring and Assessment, which is within the ME DMR's Bureau of Marine Science. I have a B.A. in Biology from Truman State University and a M.A. in Biology from the Boston University Marine Program;

2.  Throughout my employment at ME DMR I have been responsible for designing and implementing all the scientific programs associated with marine mammals and sea turtles. This has included research grants and collaborative projects regarding the distribution and habitat use of large whales in Maine coastal waters, as well as extensive work with the commercial fishing

industry documenting gear use, distribution, and testing of experimental gear aimed at reducing the risk of entanglement to large whales;

3. I am a Level III responder in the Atlantic Large Whale Disentanglement Network, administer the disentanglement program at ME DMR in collaboration with Maine Marine Patrol, and have been trained in sea turtle disentanglement response;

4. I serve as ME DMR's representative on the Atlantic Large Whale Take Reduction Team (ALWTRT). I have been a member of the Atlantic Scientific Review Group (ASRG) since 2017 and served as chair in 2019. The ASRG is an appointed advisory body to National Oceanic and Atmospheric Agency (NOAA) Fisheries and serves as the peer review for all marine mammal stock assessment reports. I am also a member of the Northeast Right Whale Recovery Plan Implementation Team;

5. In addition to my duties regarding protected species, I oversee programs that include lobster, scallop, urchin, herring, halibut, and shrimp scientific monitoring and research, as well as DMR's inshore trawl survey, and recreational fishing and landings programs;

6. Currently, Maine lobster gear is required to be configured with a vertical line which connects a lobster trap, or a series of lobster traps known as a trawl, to a surface buoy system. Trawls either have one or two vertical lines, depending on the number of traps in the trawl and oceanographic conditions. The rope along the ocean floor, which connects traps in a trawl, is usually referred to as groundline.  A key function of the surface buoy and vertical line is to allow lobstermen to locate their traps and then haul them from the ocean floor to the fishing vessel. Hauling frequencies vary along the coast and between seasons; however, a vertical line may be used to haul a trap or trawl several times per week.

7. Another key function of the surface buoy is to identify the location of the gear not just to the lobsterman who set it, but to others who need to be aware of the gear's presence. This includes other lobstermen setting gear in the same area, law enforcement officials, mobile gear fishermen (such as trawlers) utilizing the same bottom, and commercial and recreational boaters. Under the current regulatory environment and without technology to replace the visibility of gear, buoyless or ropeless fishing would significantly impact the operation of the fishery. The increase in the occurrence of gear conflicts between fixed and mobile gear fishermen would result in gear loss, and therefore, ghost gear. Enforcement of resource conservation laws would be made impossible within existing resources. In addition to enforcement officers having no way to locate gear to ensure its compliance with state and federal law, DMR would not have the resources to outfit all patrol vessels with all available ropeless fishing technologies so that any given set of gear could be hauled and set back appropriately.

8. Testing is underway for ropeless fishing technologies, in which no vertical lines and buoys at the surface are used to haul traps. Ropeless technologies are being tested by fishermen on the US and Canadian east coasts who are trying to gain access to areas that have been closed to fishing due to the presence of large aggregations of right whales. Maine has no such closures. The Maine lobster fishery operates on a hard and dynamic bottom substrate, which results in fishermen fishing tightly together to access prime lobster habitat. Due to the resulting gear densities, the size of the fishery, the lack of available technology needed to conduct this type of fishery, and the enforcement challenges that it presents, ropeless fishing will not be a viable option in Maine until development and testing of gear can solve these issues. Additionally, the current estimated cost of ropeless fishing technology is significantly more than the cost of traps currently used in the fishery. I am aware of no Maine-licensed lobsterman who has sought

permission to use ropeless gear throughout his or her commercial fishing operation. To the contrary, ME DMR has received significant opposition from industry members in public meetings regarding the use of ropeless gear, given the cost and feasibility, and other challenges discussed above.

    9. Development is also underway to create a way to replace the functionality of the buoy as a marker of the gear's set location. This includes deploying modems to track the location of traps on the bottom and relay this information to the fishermen who set it and others who need to know the location of gear, such as other lobstermen fishing nearby (who need to be able to avoid setting their gear over the top of someone else), enforcement officials (who need to be able to haul gear for inspection) and mobile gear fishermen (who need to be able to maneuver to avoid gear). The technology to locate traps on the bottom is still in the concept phase and has not been tested on a large scale, nor is it commercially available.

    10. ME DMR has been an active participant on the ALWTRT and has routinely worked with state and federal partners to better the science and data needed to support this group's discussions. ME DMR is committed to solving issues regarding the endangered status of right whales and recognizes that the ALWTRT process allows for input from multiple caucuses, including fishermen, Non-Governmental Organizations, and state agencies;

    11. ME DMR has actively contributed to the development and implementation of protective measures for right whales through participation in the ALWTRT since the Team's inception. ME DMR has reflected measures implemented in the Atlantic Large Whale Take Reduction Plan (ALWTRP) into state regulations to ensure sufficient enforcement, and therefore high industry compliance. These measures have included 600-pound weak links at the buoy, gear markings to

identify gear, sinking groundline to reduce entanglements, and trawling-up requirements (a minimum number of traps fished on a trawl) to reduce the number of vertical lines in the fishery;

12. ME DMR also has a history of expanding measures beyond the minimum federal requirements into areas exempted from the federal ALWTRP. ME DMR prohibits float rope on the surface for all lobster pot gear, including gear fished inside the federal exemption line– an area that NOAA found, based on scientific data, that endangered large whales rarely venture into (72 Fed. Reg. 57104, 57162 (Response to comment 337)).  The presence of right whales is extremely rare shoreward of this federal exemption line.  The majority of ME DMR-licensed lobstermen are permitted to fish only in state waters, and approximately 70% of state waters are located shoreward of Maine's federal exemption line;

13. ME DMR is at the forefront of efforts to improve gear marking requirements by improving the spatial resolution of gear marking (i.e., marking that allows one to determine where the gear was initially set), as well as increasing the probability that a mark will be seen and identified to the set location and fishery. It has already adopted rules to implement new gear marking requirements which prescribe a Maine-specific purple gear mark, increase the frequency of markings on a rope, and expand gear marking requirements into exempted waters. These new regulations will be required by September 2020, ahead of the current federal regulatory process;

14.  ME Marine Patrol and the Bureau of Marine Science collaborate with NOAA Fisheries, serving as primary regional responders to address whale and sea turtle entanglements on the Maine Coast. There are approximately 46 uniformed field personnel trained to a minimum of Level I and capable of responding to entanglements for initial assessment and stand-by purposes. Nine officers, in addition to myself, have undergone large whale disentanglement apprentice training and hold their Level III authorizations under the Marine Mammal Health and Stranding

Response Program's permit. This authorization designates the holder as a primary responder for disentanglement activities. As a part of the Atlantic Large Whale Disentanglement Network, ME DMR's primary responders work with NOAA Fisheries and other network members to engage in assessment, reporting, and response when reports of entanglements are received;

15. Many of the above regulations and activities have been adopted without a clear understanding of the significance that Maine's lobster fishery plays in right whale entanglements. The majority of entanglement cases involve rope of unknown country and fishery of origin. The last known right whale entanglement in Maine lobster gear was in 2004, with a whale named Kingfisher. Maine lobster gear was one of many pieces of gear removed from that entanglement case, but it was not necessarily known to be the originating or primary entanglement. Since 2017, there have been thirty documented cases of right whale serious injury and mortality. None of these cases have been attributed to the Maine lobster fishery;

16. The data also suggest previous regulations, particularly the implementation of sinking groundline which occurred in 2009, have been effective in reducing entanglements. In fact, since the federal sinking groundline rule went into place, there have been no right whale entanglements linked to groundlines from the US lobster fishery;

17. In contrast, there is evidence that indicates other causes are contributing to an increasing portion of right whale serious injuries and mortalities. Of the thirty documented cases of right whale serious injury and mortality since 2017, twenty-one have occurred in Canada.  This includes nine cases of serious injury and mortality occurring in Canada in 2019. Further, since 2017, an additional two mortalities, which were first sighted in US waters, have been attributed to Canadian snow crab gear entanglements;

18. Looking further back to the period between 2013- 2017 in the latest right whale stock assessment report, the only cases of right whale serious injury and mortality attributed to US fisheries were the result of netting and unattributed gear;

19. Trends in the right whale entanglement dataset indicate that since 2010 the majority of rope taken off of right whales that results in serious injury or mortality is not characteristic of rope used in the Maine lobster fishery. Based on a 2018 industry survey, ME DMR found the most prominent rope diameters used in the Maine lobster fishery are 3/8" rope followed by 7/16" rope. Results of the survey also showed that over 79% of rope used in the Maine lobster fishery is less than ½" in diameter. In contrast, entanglement records indicate that, between 2010 and 2018, 81% of all recovered rope taken off right whales was greater than ½" diameter. This is consistent with the increase in the number of entanglement cases in Canadian snow crab gear during this time frame, which uses larger diameter line than inshore lobster fisheries;

20. In summary, in the last decade, no right whale entanglement cases of known country and fishery of origin have been linked to the Maine lobster fishery. The number of known serious injuries and mortalities from other sources, such as Canadian vessels strikes and entanglement in snow crab gear, have increased, particularly in the last three years.

21. Recent studies show that right whale habitat use and residency times in historically known feeding habitats are also changing. Since 2010, right whale occurrence in the Gulf of Maine has declined, most likely due to large-scale changes in food supply. Conversely, there has been a documented increase in habitat use in other areas, including the Gulf of St. Lawrence in Canada, an area south of Nantucket, and an increased reliance on Cape Cod Bay.;

22. The majority of Maine state waters, where most of Maine lobster license holders are permitted to fish, are exempted from the ALWTRP and outside designated right whale critical

habitat. This spatial designation (i.e., within or shoreward of the federal exemption line and right whale critical habitat boundary) was based on the low number of right whale sightings, as well as oceanographic conditions that are unlikely to support the transport and aggregation of right whale prey within this area;

23. In an effort to continue to improve the resolution of right whale data in the nearshore waters of the Gulf of Maine, ME DMR is undertaking a collaborative project in conjunction with NOAA's Northeast Fishery Science Center. Early in 2020, eight sound traps are being deployed at sites within Maine's state waters where much of the fishery operates. While not an area expected to be used by right whales in high numbers, these sounds traps will passively record any right whale vocalizations to document spatial or temporal patterns of habitat use if right whales should utilize this area while transiting.

24. The Maine lobster fishery is a critical component of the State's economy and culture. Direct revenues from the first point of sale were $491 million. A recent economic study concluded the Maine lobster supply chain contributes an additional $1 billion in economic impact to the state annually. The fishery supports approximately 4,800 lobster license holders and 1,100 student license holders, as well as many other individuals who do not have a lobster license but are an integral part of the fishery's operations, including dealers, processors, sternmen, bait dealers, gear suppliers, and boat mechanics. Many more participate in the logistics and tourism businesses associated with the lobster industry. Maine's coastal communities are particularly dependent on lobster fishing and related business due to low alternate wages and limited career options in those communities. Given the current state and cost of ropeless fishing and trap locating technologies and the specific characteristics of the Maine lobster fishery, a

prohibition on the use of vertical buoy lines would effectively shut down the Maine lobster fishery as lobstermen would have no feasible alternative to set and retrieve their traps.

I declare under penalty of perjury that the foregoing is true and correct.

Dated at Augusta, Maine, this 23rd day of January, 2020

/s/ Erin Summers_____
Erin Summers
Maine Department of Marine Resources
Director, Division of Biological Monitoring and Assessment
Protected Resources Scientist