UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| MAN AGAINST XTINCTION A/K/A M.A.X <br><br> Plaintiff <br><br> v. <br><br> COMMISSIONER, STATE OF MAINE DEPARTMENT OF MARINE RESOURCES <br><br> and <br><br> ASSISTANT ADMINISTRATOR, NATIONAL MARINE FISHERIES SERVICE ("NMFS") <br><br> Defendants | **Civil Action No. 1:19cv406LEW** |

# DECLARATION OF ERIN SUMMERS

I, Erin Summers, hereby declare as follows:

1. I have been employed by Maine Department of Marine Resources ("Maine DMR") for 14 years. I was originally hired as a Marine Resource Scientist I, with a working title of Protected Species Biologist. I was promoted to the position of Marine Resource Scientist IV in January of 2017. I am currently the Director of the Division of Biological Monitoring and Assessment, which is within the Maine DMR's Bureau of Marine Science. I have a B.A. in Biology from Truman State University and a M.A. in Biology from the Boston University Marine Program;

2. Throughout my employment at Maine DMR, I have been responsible for designing and implementing all the scientific programs associated with marine mammals and sea turtles. This has included research grants and collaborative projects regarding the distribution and habitat use of large whales in Maine coastal waters as well as extensive work with the commercial fishing

industry documenting gear use, distribution, and testing of experimental gear aimed at reducing the risk of entanglement to large whales;

3. I am a Level III responder in the Atlantic Large Whale Disentanglement Network, administer the disentanglement program at Maine DMR in collaboration with Maine Marine Patrol, and have been trained in sea turtle disentanglement response;

4. I serve as Maine DMR's representative on the Atlantic Large Whale Take Reduction Team (ALWTRT). I have been a member of the Atlantic Scientific Review Group (ASRG) since 2017 and served as chair in 2019. The ASRG is an appointed advisory body to National Oceanic and Atmospheric Agency (NOAA) Fisheries and serves as the peer review for all marine mammal stock assessment reports. I am also a member of the Northeast Right Whale Recovery Plan Implementation Team;

5. In addition to my duties regarding protected species, I oversee programs that include lobster, scallop, urchin, herring, halibut, and shrimp scientific monitoring and research, as well as Maine DMR's inshore trawl survey, and recreational fishing and landings programs;

6. Currently, Maine lobster gear is required to be configured with a vertical line which connects a lobster trap, or a series of lobster traps known as a trawl, to a surface buoy system. Trawls either have one or two vertical lines, depending on the number of traps in the trawl and oceanographic conditions. The rope along the ocean floor, which connects traps in a trawl, is usually referred to as groundline. A key function of the surface buoy and vertical line is to allow lobstermen to locate their traps and then haul them from the ocean floor to the fishing vessel. Hauling frequencies vary along the coast and between seasons; however, a vertical line may be used to haul a trap or trawl several times per week;

7. Another key function of the surface buoy is to identify the location of the gear not just to the lobsterman who set it but to others who need to be aware of the gear's presence. This includes other lobstermen setting gear in the same area, law enforcement officials, mobile gear fishermen (such as trawlers) utilizing the same bottom, and commercial and recreational boaters.

8. Maine DMR has been an active participant on the ALWTRT and has routinely worked with state and federal partners to better the science and data needed to support this group's discussions. Maine DMR is committed to solving issues regarding the endangered status of right whales and recognizes that the ALWTRT process allows for input from multiple caucuses, including fishermen, non-governmental organizations, and state agencies;

9. Maine DMR has actively contributed to the development and implementation of protective measures for right whales through participation in the ALWTRT since the Team's inception. Maine DMR has reflected measures implemented via the Atlantic Large Whale Take Reduction Plan (ALWTRP) in state regulations to ensure sufficient enforcement and therefore high industry compliance. These measures have included 600-pound weak links at the buoy, gear markings to identify gear, sinking groundline to reduce entanglements, and trawling-up requirements (a minimum number of traps fished on a trawl) to reduce the number of vertical lines in the fishery;

10. Maine DMR also has a history of expanding measures beyond the minimum federal requirements into areas exempted from the federal ALWTRP. Maine DMR prohibits float rope on the surface for all lobster pot gear, including gear fished inside the federal exemption line—an area into which NOAA found, based on scientific data, endangered large whales rarely venture (72 Fed. Reg. 57104, 57162 (Response to comment 337)). The presence of right whales is extremely rare shoreward of this federal exemption line. The majority of Maine DMR-licensed lobstermen are

permitted to fish only in state waters, and approximately 70% of state waters are located shoreward of Maine's federal exemption line;

11. The Plaintiff's claim that in 2020 the National Marine Fisheries Service (NMFS) established Potential Biological Removal (PBR) for right whales at 0.5, which is the level at which the annual average of serious injuries or mortalities can't exceed, is incorrect. Strahan Memorandum at 2. The latest finalized stock assessment for right whales is the 2018 NOAA assessment that covers the years 2012-2016, and which has a PBR of 0.9. https://www.fisheries.noaa.gov/webdam/download/92736481 (last accessed June 12, 2020). NOAA's 2019 draft stock assessment, which covers the years 2013-2017, has a PBR of 0.8. https://www.fisheries.noaa.gov/webdam/download/99536348 (last accessed June 12, 2020);

12. Plaintiff's claim that right whales will go extinct if a single right whale in 2020 gets either killed or seriously injured is misleading. Strahan Memorandum at 2-3. NOAA's stock assessments run on a 2-year lag and are averaged over a five-year window, so the requirement regarding PBR as of the 2019 draft assessment would be to not exceed 0.8 right whale serious injury or mortalities annually averaged over the five year window (2013-2017). Management measures are triggered when serious injuries and mortalities exceed that annual average in a given assessment's 5-year window. Nowhere in NOAA's stock assessment is it stated that right whales would go extinct if one right whale is killed or seriously injured in any one given year. In fact, if there was one right whale death in 2020 and zero in 2021 the PBR would not be exceeded;

13. Plaintiff's claim that in 2020 NOAA designated Maine's lobster and gillnet fisheries as Category I Fisheries is misleading. Strahan Memorandum at 3. NOAA's designation for the lobster pot fishery pertains to waters from the Gulf of Maine to North Carolina, and the designation for the gillnet fishery pertains to waters from the Gulf of Maine to Long Island New

York. *See* https://www.fisheries.noaa.gov/national/marine-mammal-protection/list-fisheries-summary-tables#table-2---commercial-fisheries-in-the-atlantic-ocean,-gulf-of-mexico,-and-caribbean;

14. The Plaintiff's claims that, in designating Maine's lobsterpot and gillnet fisheries as a Class I fishery, NOAA made a scientific finding that Maine's lobsterpot and gillnet fisheries licensed and regulated by the Maine DMR are commercial fisheries that "annually kill and seriously injure Northern Right Whales and members of other endangered whale species in excess that these species can biologically tolerate" and that NMFS has determined "the DMR's licensing of lobsterpot and gillnet fisheries is expected in 2020 to repeatedly kill and seriously injure Right Whales and other endangered whale species owing to its use of VBR" are incorrect. Strahan Memorandum at 3. NOAA's list of Category I fisheries is not a scientific finding that Maine's lobsterpot and gillnet fisheries annually kill or seriously injure right whales or other endangered species. It also does not mean that Maine's fisheries are expected in 2020 to kill or seriously injure right whales or other endangered species. When a fishery is designated as Class I, it simply means that the fishery, as a whole, is more likely to incidentally kill or seriously injure marine mammals;

15. The Plaintiff's reliance on Hauke Kite-Powell, et al., (2014) "Modeling the distribution of the North Atlantic right whale Eubalaena glacialis off coastal Maine by areal co-kriging." Endangered Species Research. 24:(21–31). doi: 10.3354/esr00579, for the claim that scientific studies show that right whales face significant risk at being entangled by Maine fishing activity, is misplaced. The study referenced looks at a new method for modeling where right whales occur in the Gulf of Maine, but it does not conclude that right whales face a significant risk of being entangled in Maine gear. In fact, as stated below, no right whale entanglement cases of known country and fishery of origin have been linked to the Maine lobster fishery since 2004;

5

16. The Plaintiff's claim that in 2019 NMFS issued a status report categorizing ongoing entanglement in the Maine lobsterpot and gillnet fishing gear as the "single greatest threat to the survival of right whales" is incorrect. Strahan Memorandum at 10. In support of his claim Strahan cites to a technical paper entitled "North Atlantic Right Whales – Evaluating their Recovery Chances in 2018." *NOAA Technical Memorandum NMFS-NE-247*. This paper uses the Maine lobster fishery as a case study to illustrate potential changes in the fishery over time but does not make the statement alleged by the Plaintiff. In fact, the paper concludes by stating that the decline in right whales began in 2010, which coincided with a range shift in the right whale population;

17. The Plaintiff's claim that Maine DMR voted on a resolution that claimed right whales get entangled in Maine waters at an April 2019 ALWTRT meeting is false. Strahan Memorandum at 19. I attended the ALWTRT meeting as Maine DMR's representative. There was a vote on a strategy to reduce the risk associated with fishing gear, and one way Maine proposed to achieve this was through a 50% reduction in vertical lines. However, there was nothing in the recommendation that claimed right whales get entangled in Maine waters;

18. The Plaintiff's claim that "The Recovery of Northern Right Whales has been constrained by *Hominin* caused mortality," *Royal Society Open Science*. 5:180892. doi:10 1098/rsos.180892, Peter Corkeron et al. (2018) assessed the negative impact on right whale recovery from the entanglement and killing of right whales in lobsterpot and gillnet fishing gear off the Maine coastline is inaccurate and misleading. Strahan Memorandum at 12. While the paper does discuss impacts of entanglements on the right whale population, it does not specifically mention lobster gear, nor does it specifically discuss Maine gear or Maine waters;

19. The Plaintiff's claim that NOAA's assistant administrator sent a letter to the Maine Lobsterman's Association "emphasizing that it needed to cooperate with NOAA to lessen Maine's

6

lobsterpot fishery ongoing rate of entanglements, killings and serious injuring of Right Whales" is misleading. Strahan Memorandum at 11. While the letter stresses the importance of implementing measures to reduce the risk of whale entanglements across the region, in multiple fisheries, and with our Canadian counterparts, nowhere in the letter is the Maine lobster fishery singled out as being primarily responsible for right whale entanglements;

20. The Plaintiff's claim that on September 17, 2019, right whale researchers "licensed and funded by NMFS" sent a letter to Senator Collins claiming that right whale entanglements occur everywhere there is fishing gear is misleading. Strahan Memorandum at 12. The letter does not present any direct recent evidence of right whales being seriously injured or killed in Maine DMR-licensed lobster gear. In fact, the figures appended to the letter of right whale sightings in the Gulf of Maine supports the assertion that the majority of right whale sightings occur beyond the state waters three-mile limit;

21. The NOAA map of right whale sightings along the northeast coast attached to Plaintiff's Memorandum is misleading. Strahan Memorandum at 12-13. The map shows right whale sightings for the month of June over a range of years but, in the form attached, is not usable to determine the number, location (i.e., distance from shore) or frequency of right whale sightings in Maine state waters. Moreover, I disagree with the Plaintiff's claim that the map shows "many historical sightings of right whales in Maine state waters for the month of June." Strahan Memorandum at 12-13. I have been unable to recreate the same map or the same locations of sightings when mapping June right whale sightings in the Gulf of Maine using NOAA's public mapping website. In fact, while the state waters three-mile delineation is not on this mapping tool, there appears to be only two sightings across all years in the database in June that are inside Maine state waters;

22. Plaintiff's claim that Maine coastal waters have been scientifically proven to be essential habitat for right whales and other endangered species is not accurate. Strahan Memorandum at 2. Plaintiff cites NOAA's 2018 right whale stock assessment for this claim. However, the stock assessment doesn't discuss Maine state waters as essential habitat for right whales. In fact, critical habitat takes up only a small portion of Maine state waters; and there have been few scientific publications documenting the essential nature of Maine state waters for right whales;

23. Plaintiff's claims that all of Maine waters have been designated as critical habitat for right whales is inaccurate. Strahan Memorandum at 3-4. Only 30% of Maine state waters fall within right whale critical habitat and not because of sightings of right whales but, rather, because of oceanographic features that are important for right whale prey, calanus finmarchicus. The other 70% of Maine state waters are outside right whale critical habitat and are exempt from the Atlantic Large Whale Take Reduction Plan;

24. Maine DMR is at the forefront of efforts to improve gear marking requirements by improving the spatial resolution of gear marking (i.e., marking that allows one to determine where the gear was initially set), as well as increasing the probability that a mark will be seen and identified to the set location and fishery. It has already adopted rules to implement new gear marking requirements which prescribe a Maine-specific purple gear mark, increase the frequency of markings on a rope, and expand gear marking requirements into exempted waters. (See 13-188 CMR chapters 75.02.A.2, 75.02.A.3 and 75.02.A.4.) These new requirements are effective September 2020, ahead of the current federal regulatory process;

25. Maine Marine Patrol and the Bureau of Marine Science also collaborate with NOAA Fisheries, serving as primary regional responders to address whale and sea turtle entanglements on the Maine Coast. There are approximately 46 uniformed field personnel trained to a minimum of

Level I and capable of responding to entanglements for initial assessment and stand-by purposes. Nine officers, in addition to myself, have undergone large whale disentanglement apprentice training and hold their Level III authorizations under the Marine Mammal Health and Stranding Response Program's permit. This authorization designates the holder as a primary responder for disentanglement activities. As a part of the Atlantic Large Whale Disentanglement Network, Maine DMR's primary responders work with NOAA Fisheries and other network members to engage in assessment, reporting, and response when reports of entanglements are received;

26. In response to the finding that the removal of right whales exceeded the Potential Biological Removal (PBR) established pursuant to the Marine Mammal Protection Act, Maine DMR completed a thorough analysis of the risks occasioned by the overlap of the Maine lobster fishery with the transit of right whales through the Gulf of Maine. Maine DMR also evaluated the impacts of a suite of management measures intended to reduce the risk and severity of right whale entanglements in lobster fishing gear. Based on that analysis, Maine DMR outlined additional whale protection measures in a proposal (the "Proposal") submitted to the National Marine Fisheries Service ("NMFS") on December 27, 2019, for inclusion as a preferred alternative in the ongoing federal rulemaking process that NMFS is currently undergoing;

27. This is the only Proposal that I know of before NMFS that contains a suite of measures specific to the Maine lobster fishery. Its protective measures provide meaningful reductions in the risk of right whale entanglements in Maine waters without imposing regulatory requirements that may have limited additional protective value or impose undue burdens to the fishery;

28. Many of the above regulations and activities have been adopted, or proposed, without a clear understanding of the degree to which Maine's lobster fishery plays in right whale entanglements. This is because the majority of entanglement cases do not recover the entangling

gear, and when they do the rope's country and fishery of origin is usually unknown. Of the right whale entanglement cases where the fishery of origin is known, there have been none attributed to Maine lobster gear since 2004. The 2004 case involved a whale named Kingfisher, and while Maine lobster gear was one of many pieces of gear removed from that entanglement case, it was not necessarily known to be the originating or primary entanglement. Since 2017, there have been thirty documented cases of right whale serious injury and mortality. None of these cases have been specifically attributed to the Maine lobster fishery;

29. The data also suggest previous regulations, particularly the implementation of sinking groundline, have been effective in reducing entanglements. In fact, since the federal sinking groundline rule went into place in 2009, there have been no right whale entanglements linked to groundlines from the American lobster fishery;

30. In contrast, there is evidence that indicates other causes are contributing to an increasing portion of right whale serious injuries and mortalities. Of the thirty documented cases of right whale serious injury and mortality since 2017, twenty-one were reported in Canada. This includes nine cases of serious injury and mortality reported in Canada in 2019. Further, since 2017, an additional two mortalities, which were first sighted in US waters, have been attributed to Canadian snow crab gear entanglements. (NOAA Fisheries. 2017-2019 North Atlantic Right Whale Unusual Mortality Event, www.fisheries.noaa.gov/national/marine-life-distress/2017-2020-north-atlantic-right-whale-unusual-mortality-event (last visited May 27, 2020));

31. Looking further back to the period between 2013- 2017 in the latest draft right whale stock assessment report, the only case of right whale serious injury or mortality attributed to the US due to entanglement was the result of gear not able to be attributed to a specific fishery. (NOAA Fisheries 2019 Draft Marine Mammal Stock Assessment Reports,

www.fisheries.noaa.gov/national/marine-mammal-protection/draft-marine-mammal-stock-assessment-reports (last visited May 27, 2020));

32. Trends in the right whale entanglement dataset indicate that since 2010 the majority of rope taken off of right whales that results in serious injury or mortality is not characteristic of rope used in the Maine lobster fishery. Based on a 2018 industry survey, Maine DMR found the most prominent rope diameters used in the Maine lobster fishery are 3/8" rope followed by 7/16" rope. Results of the survey also showed that over 79% of rope used in the Maine lobster fishery is less than ½" in diameter. In contrast, entanglement records indicate that between 2010 and 2018, 81% of all recovered rope taken off right whales was greater than ½" diameter. (ALWTRT October 2018 Meeting. Presentation by GARFO Staff re: Line Diameter, archive.fisheries.noaa.gov/garfo/protected/whaletrp/trt/meetings/October%202018/eg_line_diameter.pdf (last visited May 27, 2020)). This is consistent with the increase in the number of entanglement cases in Canadian snow crab gear during this time frame, which uses larger diameter line than inshore lobster fisheries;

33. In summary, in the last decade, no right whale entanglement cases of known country and fishery of origin have been linked to the Maine lobster fishery. The number of known serious injuries and mortalities from other sources, such as Canadian vessels strikes and entanglement in snow crab gear, have increased, particularly in the last three years. (NOAA Fisheries. 2017-2019 North Atlantic Right Whale Unusual Mortality Event, www.fisheries.noaa.gov/national/marine-life-distress/2017-2020-north-atlantic-right-whale-unusual-mortality-event (last visited May 27, 2020));

34. The latest NOAA Fisheries final stock assessment for North Atlantic right whales (2018) does not specifically identify Maine state waters as a place where right whales aggregate. The

assessment states "Visual and acoustic surveys have demonstrated the existence of seven areas where western North Atlantic right whales aggregate seasonally: the coastal waters of the southeastern U.S.; the Great South Channel; Jordan Basin; Georges Basin along the northeastern edge of Georges Bank; Cape Cod and Massachusetts Bays; the Bay of Fundy; and the Roseway Basin on the Scotian Shelf. https://www.fisheries.noaa.gov/webdam/download/93630368 (last visited June 12, 2020);

35. The Plaintiff's claim that earlier in 2020 remotely piloted drones with acoustic sensors detected right whales in abundance in Maine waters is incorrect. Strahan Memorandum at 2. Passive acoustic glider studies were conducted by a Woods Hole Oceanic Institution scientist and a scientist from NOAA's Northeast Fisheries Science Center, which involved transects starting in December 2019, in the Downeast portion of the Gulf of Maine and ending in April 2020, off the coast of Massachusetts. The track lines were mostly offshore and the only right whale detections were classified as "possible" and occurred roughly 40 miles offshore near a feature called Outer Falls. http://dcs.whoi.edu/gom1219/gom1219_we03.shtml (last visited June 12, 2020);

36. While right whales are a resident endangered species of Maine, there is no evidence to suggest they aggregate inside the 3-mile line where the majority of Maine's lobster fishery is licensed to fish;

37. Recent studies show that right whale habitat use and residency times in historically known feeding habitats are also changing. Since 2010, right whale occurrence in the Gulf of Maine has declined, most likely due to large-scale changes in food supply. (Davis, G. E., *et al.* 2017. *Long-term passive acoustic recordings track the changing distribution of North Atlantic right whales (Eubalaena glacialis) from 2004 to 2014*. Scientific Reports. 7:13460 (1-12); Record, N., *et al.* 2019. *Rapid Climate-Driven Circulation Changes Threaten Conservation of Endangered North*

*Atlantic Right Whales*. Oceanography, 32, 2: 162-169.) Conversely, there has been a documented increase in right whale habitat use in other areas, including the Gulf of St. Lawrence in Canada, waters south of Nantucket, and an increased reliance on Cape Cod Bay. (Mayo C., *et al.* 2018. *Distribution, demography and behavior of North Atlantic right whales (Eubalaena glacialis) in Cape Cod Bay, Massachusetts 1998-2013*. Marine Mammal Science. 34(4): 979-996; Charif R.A. *et al.* 2019. *Phenological changes in North Atlantic right whale habitat use in Massachusetts Bay. Global Change Biology*, 00:1-12; Simard Y. *et al.* 2019. *North Atlantic right whale shift to the Gulf of St. Lawrence in 2015, revealed by long-term passive acoustics.* Endangered Species Research. 40: 271-284; DFO. 2019. *Review of North Atlantic right whale occurrence and risk of entanglements in fishing gear and vessel strikes in Canadian waters.* DFO Can. Sci. Advis. Sec. Sci. Advis. Rep. 2019/028; Sorochan, K.A. *et al.* 2019. *North Atlantic right whale (Eubalaena glacialis) and its food: (II) interannual variations in biomass of Calanus spp. on western North Atlantic shelves.* Journal of Plankton Research. 41 (5) 687–708));

38. The majority of Maine state waters, where most of Maine lobster license holders are permitted to fish, are exempted from the ALWTRP and outside designated right whale critical habitat. This spatial designation (i.e., within or shoreward of the federal exemption line and right whale critical habitat boundary) was based on the low number of right whale sightings, as well as oceanographic conditions that are unlikely to support the transport and aggregation of right whale prey within this area;

39. In an effort to continue to improve the resolution of right whale data in the nearshore waters of the Gulf of Maine, Maine DMR is undertaking a collaborative project in conjunction with NOAA's Northeast Fishery Science Center. Early in 2020, eight sound traps were deployed at sites within Maine's state waters where much of the fishery operates. While not an area

expected to be used by right whales in high numbers, these sound traps will passively record any right whale vocalizations to document spatial or temporal patterns of habitat use if right whales should utilize this area while transiting;

40. The Maine lobster fishery is a critical component of the State's economy and culture. In 2018, direct revenues from the first point of sale were $491 million. https://www.maine.gov/dmr/commercial-fishing/landings/documents/LandingsBySpecies.Table.pdf (last visited May 27, 2020). A recent economic study concluded the Maine lobster supply chain contributes an additional $1 billion in economic impact to the state annually. (Lobsters to Dollars: The Economic Impact of the Lobster Distribution Supply Chain in Maine by Michael Donihue, Colby College. June 2018). The fishery supports approximately 4,800 lobster license holders and 1,100 student license holders, as well as many other individuals who do not have a lobster license but are an integral part of the fishery's operations, including dealers, processors, sternmen, bait dealers, gear suppliers, and boat mechanics. Many more participate in the logistics and tourism businesses associated with the lobster industry. Maine's coastal communities, particularly in downeast and mid-coast Maine, are dependent on lobster fishing and related business due to low alternate wages and limited career options in those communities. (Gulf of Maine Research Institute. Understanding Opportunities and Barrier to Profitability in the New England Lobster Industry 13 (2014)), www.gmri.org/sites/default/files/resource/gmri_ 2014_lobster_survey.pdf. (last visited May 27, 2020));

41. Testing is underway for ropeless fishing technologies, in which no surface buoys and lines are used to mark and haul traps. Instead, release devices are used to either bring the trap or the hauling rope to the surface for a fisherman to retrieve the gear.

42. Under the current regulatory environment and without technology to replace the visibility of gear, buoyless or ropeless fishing would significantly impact the operation of the Maine lobster fishery and other adjacent fisheries. Without a way to identify the location of lobster gear, there would be an increase in the occurrence of gear conflicts between individual lobstermen, as well as fixed and mobile gear fishermen. These gear conflicts would result in gear loss and additional ghost gear on the ocean floor. Further, enforcement of resource conservation laws would be made impossible within existing resources. Enforcement officers would have no way to locate gear to ensure its compliance with state and federal law, and Maine DMR would not have the resources to outfit all patrol vessels with all available ropeless fishing technologies so that any given set of gear could be hauled and set back appropriately.

43. Ropeless technologies are being tested by fishermen on the east coasts of the United States and Canada. Tests are primarily being done with fishermen who are trying to gain access to areas that have been closed to fishing due to the presence of large aggregations of right whales or where other gear modifications are not compatible with fishing operations in that area. Alternatively, Maine DMR is currently working with the Maine lobster fishery to test gear modifications that decrease the strength of hauling lines at specific points or otherwise allow the line to break in the event that a whale gets entangled. The Maine lobster fishery operates on a hard and dynamic bottom substrate, which results in fishermen fishing tightly together to access prime lobster habitat. Due to the resulting gear densities, the size of the fishery, the lack of available technologies needed to conduct this type of fishery, and the enforcement challenges that it presents, ropeless fishing will not be a viable option in Maine until development and testing of gear can solve these issues.

44. Development is also underway to create a way to replace the functionality of the buoy as a marker of the gear's set location. This includes deploying modems to track the location of traps on

the bottom and relay this information to the fishermen who set it and others who need to know the location of gear, such as other lobstermen fishing nearby (who need to be able to avoid setting their gear over the top of someone else), enforcement officials (who need to be able to haul gear for inspection) and mobile gear fishermen (who need to be able to maneuver to avoid gear). The technology to locate traps on the bottom is still in the concept phase and has not been tested on a large scale, nor is it commercially available.

45. Given the current state and cost of ropeless fishing technologies and trap locating technologies as well as the specific characteristics of the Maine lobster fishery, a prohibition on the use of vertical buoy lines would effectively shut down the Maine lobster fishery as lobstermen would have no feasible alternative to set and retrieve their traps.

I declare under penalty of perjury that the foregoing is true and correct.

Dated at Augusta, Maine, this 18th day of June 2020

/s/ Erin Summers
Erin Summers
Maine Department of Marine Resources
Director, Biomonitoring and Assessment Division
Protected Resources Coordinator